### UNITED STATES v. TWO BARRELS OF DESICCATED EGGS.

(District Court, D. Minnesota, Fourth Division. March 20, 1911.)

1. FOOD (§ 24*)—FORFEITURE—JURISDICTION.

Food and Drug Act June 30, 1906, c. 3915, § 10, 34 Stat. 771 (U. S. Comp. St. Supp. 1909, p. 1193), providing that proceedings in cases to forfeit adulterated food shall conform as near as may be to proceedings in admiralty, does not render such proceedings within the admiralty or maritime jurisdiction of federal courts; the jurisdiction in such proceedings being conferred by the act itself.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 17; Dec. Dig. § 24.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. FOOD (§ 24*)—ILLEGAL FOOD—FORFEITURE—JURISDICTION—STATUTES.

Food and Drug Act June 30, 1906, c. 3915, § 4, 34 Stat. 769 (U. S. Comp. St. Supp. 1909, p. 1189), authorizes the Secretary of Agriculture to make investigations and to certify violations of the act to the United States district attorney, and section 5 requires such officers on being informed that an act has been violated to cause appropriate proceedings to be commenced in the proper court, which are required by section 10 to conform as near as may be to proceedings in admiralty. *Held*, that neither the marshal nor any other person was authorized to seize food claimed to be subject to forfeiture prior to the commencement of proceedings for a forfeiture in court, and that proceedings for such forfeiture did not depend for jurisdiction on prior seizure.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 17; Dec. Dig. § 24.*]

3. FOOD (§ 24*)—ILLEGAL FOOD—SEIZURE BY PRIVATE PERSON.

Food and Drug Act June 30, 1906, c. 3915, 34 Stat. 768 (U. S. Comp. St. Supp. 1909, p. 1187), authorizing seizure and forfeiture of illegal food, does not authorize such a seizure by a private person.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 17; Dec. Dig. § 24.*]

4. FOOD (§ 24*)—FOOD AND DRUG ACT—FORFEITURE—LIBEL.

Want of a sufficient verification of a libel to forfeit food under Food and Drug Act June 30, 1906, c. 3915, 34 Stat. 768 (U. S. Comp. St. Supp. 1909, p. 1187), is not ground for exception or demurrer to the substance of the libel.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 17; Dec. Dig. § 24.*]

5. FOOD (§ 24*)—FORFEITURE—LIBEL—TIME OF SHIPMENT.

A libel to forfeit a shipment of desiccated eggs for violation of Food and Drug Act June 30, 1906, c. 3915, 34 Stat. 768 (U. S. Comp. St. Supp. 1909, p. 1187), was not fatally defective for failure to allege the date when they were shipped in interstate commerce on the theory that the shipment might have been made before the act took effect or because the property was not sufficiently identified; such objections being available by answer.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 17; Dec. Dig. § 24.*]

6. FOOD (§ 24*)—FOOD AND DRUG ACT—APPLICATION—MATERIALS SHIPPED FOR USE.

Food and Drug Act June 30, 1906, c. 3915, § 10, 34 Stat. 771 (U. S. Comp. Supp. 1909, p. 1193), authorizing proceedings to forfeit adulterated food transported from one state to another, etc., is applicable to eggs shipped from one state to another, not for resale, but to be used solely as raw material in the manufacture of some other product.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 17; Dec. Dig. § 24.*]

7. COMMERCE (§ 41*)—ORIGINAL PACKAGES—JURISDICTION.

Under Food and Drug Act June 30, 1906, c. 3915, § 10, 34 Stat. 771 (U. S. Comp. St. Supp. 1909, p. 1193), providing for seizure and forfeiture of adulterated food shipped from one state to another for sale, or, having been transported, remains unloaded, unsold in the original unbroken packages, etc., the jurisdiction of the federal government over interstate shipments of adulterated food continues while the food remains in the original unbroken packages at the point of destination.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 30, 31; Dec. Dig. § 41.*]

Libel by the United States against Two Barrels of Desiccated Eggs. On exceptions filed by Armour & Co., claimants. Overruled.

C. C. Houpt, U. S. Dist. Atty.
F. H. Stinchfield, for claimant.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

WILLARD, District Judge. This is a proceeding under section 10 of the food and drugs act of June 30, 1906 (Act June 30, 1906, c. 3915, 34 Stat. 771 [U. S. Comp. St. Supp. 1909, p. 1193]), Armour & Co. appeared as claimant of the property, and has filed exceptions to the libel.

1. The first exception is as follows:

"That it appears upon the face of said libel that at the time of the filing thereof no seizure of the property therein described had been made by the libelant, and that this court has, therefore, no jurisdiction over said property."

The claimant says that for the last 100 years it has been the rule in admiralty that in seizure cases the jurisdiction depended upon the fact that a seizure had been made before the libel was filed, and that, no prior seizure having been made in this case, the court has no jurisdiction.

It may be said, in the first place, that this is not a case of admiralty or maritime jurisdiction. The jurisdiction of the District Court is conferred by the act itself. The only connection that the proceeding has with admiralty is due to the fact that section 10 provides that the proceedings in such cases shall conform as near as may be to proceedings in admiralty. Section 7 of the Confiscation Act of July 17, 1862, c. 195, 12 Stat. 589, contained a similar provision; it being there stated that the "proceedings shall conform as nearly as may be to proceedings in admiralty or revenue cases." It was said, however, in The Confiscation Cases, 20 Wall. 92, at page 110, 19 L. Ed. 196, that:

"Strict conformity is not required. No doubt in cases of seizure upon land resort should be had to the common-law side of the court, and such, in substance, was, we think, the case here."

But, admitting that in cases of this kind the procedure in admiralty requires a prior seizure, it is, of course, unquestioned that Congress could change such procedure, and provide that the libel should be first filed, and then a warrant issued for the arrest of the property, making the proceeding in that respect similar to a proceeding in rem in admiralty between private persons. The only question therefore is, What in this respect does the act itself provide? If there is to be a seizure prior to any proceeding in court, there must be some provision, either in this act or in some other act, authorizing some one to make such seizure. There is nothing in the law which authorizes any one, either a private person or a public officer, to do so. By section 4 the Secretary of Agriculture is authorized to make investigations, and, if he finds that any provision of the act has been violated, he is required to certify the facts to the United States district attorney, but there is nothing here which gives him or any agent power to seize the property. Section 5 requires the district attorney, upon being informed that the act has been violated, to cause appropriate proceedings to be commenced in the proper court. This does not authorize him or the marshal or any other person to seize the property before such proceedings are commenced in court. No other law has been referred to by counsel authorizing any officer to make the seizure provided for by this act prior to a proceeding in court. It is true that in Gelston v. Hoyt, 3 Wheat. 246, 4 L. Ed. 381, Mr. Justice Story, delivering the opinion of

the court, said, on page 308, "at common law, any person may, at his peril, seize for a forfeiture to the government"; but he added:

"In the absence of all positive authority, it might be proper to resort to these principles in aid of the manifest purposes of the law. But there are express statutable provisions, which directly apply to the present case."

It appeared there that the seizure was made by the collector and surveyor of the port of New York, who it was held by the court were expressly authorized to make a seizure by the act of February 18, 1793. The same justice delivering the opinion of the court in The Josefa Segunda, 10 Wheat. 312, said on page 329, 6 L. Ed. 329:

"Under this clause, standing alone, it cannot be doubted that any person might lawfully seize such a vessel at his peril."

But it was distinctly held that the Collection Act of 1799, c. 128, § 70, made it the duty of customhouse officers to make seizures of all vessels violating the revenue laws, and the seizure was in fact made by the collector of the port of New Orleans. A fair construction of the food and drugs act does not require a holding that the seizure mentioned therein can be made by a private person. Such a provision would seem to be contrary to the general policy of the law in seizure cases. As is seen hereafter, in almost all of them, specific statutory provisions have authorized determined persons to make such seizures. To allow a private person to enter upon the premises of another, without any warrant or authority of law whatever, and to search and to seize any property which he might think was subject to confiscation, even though he did so at his peril, might lead to breaches of the peace and the disturbance of the public order. Whether the common law which allowed such a proceeding would be consistent with our constitutional provisions relating to seizures and searches presents a question of some difficulty. It cannot be held that the act in question intended to allow such a proceeding. There is nothing therefore in the law which authorizes any private person or public officer to make the seizure prior to the commencement of some proceeding in court.

An examination of the cases decided by the Supreme Court, and cited by the claimant, shows that in each one of them there was some specific provision in the law authorizing the person who did make the seizure to so make it prior to the filing of the libel. The case principally relied upon in support of the exception is The Brig Ann, 9 Cranch, 289, 3 L. Ed. 734. In that case the Intercourse Act of March 1, 1809, c. 24, 2 Stat. 528, under which the seizure was made, expressly authorized in section 8 every collector, naval officer, surveyor, or other officer of the customs to seize any property imported contrary to law; and the merchandise in question in that case was in fact seized by a revenue cutter. In The Josefa Segunda, above cited, the ship was seized for a violation of the Act of March 3, 1807, c. 22, 2 Stat. 426, relating to the slave trade. Section 7 of that act authorized the President of the United States to direct the commanders of armed vessels of the United States to seize and bring into ports of the United States any such vessels. In Clifton v. U. S., 4 How. 242, 11 L. Ed. 957, goods imported into New York and transferred to Philadelphia were seized by the customs officers there, under a claim of forfeiture by reason of

185 F.—20

undervaluation. That seizure was expressly authorized by the Act of March 2, 1799, c. 22, § 66, 1 Stat. 677. In the case of United States v. 43 Gallons of Whisky, 93 U. S. 188, 23 L. Ed. 846, the property was seized by an Indian agent. This seizure was expressly authorized by section 20 of the Act of March 15, 1864, c. 33, 13 Stat. 29. In Coffey v. United States, 116 U. S. 427, 6 Sup. Ct. 432, 29 L. Ed. 681, the distilling apparatus was seized by a deputy collector of internal revenue. He was expressly authorized to make such a seizure by section 3453 of the Revised Statutes (U. S. Comp. St. 1901, p. 2278). In United States v. Winchester, 99 U. S. 372, 25 L. Ed. 479, the cotton in question was seized by the naval forces of the United States in 1863, and afterwards condemned in the district court. It was claimed by the Attorney General that the condemnation could be sustained under the Confiscation Act of July 17, 1862, c. 195, 12 Stat. 589. That act declared in section 6 that it should be the duty of the President to seize property so made subject to confiscation.

Section 7 of that act provided that, after the property should have been seized, a proceeding in rem should be instituted in the District Court. It was held that the decree of condemnation was invalid because there was no previous seizure of the property under any order of the executive. It will be noted that in that case there was a seizure in fact, but the court held that the seizure could not confer jurisdiction upon the District Court, because it was not made by a person who was authorized to make it. This would seem to support the view hereinbefore stated, to the effect that under the law now existing in the United States a private person cannot seize property forfeited to the government. When the terms of the food and drugs act, which relate specifically to the seizure, are considered, it will be seen that they lend no support to the theory that there must be a seizure before the filing of the libel. If the phrase "for the enforcement of the penalties," found in section 5, can be said to include a forfeiture, it is still to be observed that the district attorney is required to cause the appropriate proceedings to be commenced in court. Section 10 nowhere provides that the property shall be seized, and then a libel filed for condemnation. It, on the contrary, provides that the article if adulterated shall be proceeded against in any District Court of the United States within the district where the same is found, and seized for confiscation by a process of libel for condemnation. This language indicates that the procedure shall be commenced in the District Court before the property is seized. In most of the cases which have arisen under the act to which my attention has been called, it seems that libels were filed before the seizure. United States v. 779 Cases of Molasses, 174 Fed. 325, 98 C. C. A. 197; United States v. 100 Cases of Tepee Apples (D. C.) 179 Fed. 987; United States v. 5 Boxes Asafoetida (D. C.) 181 Fed. 561; United States v. 68 Cases of Syrup (D. C.) 172 Fed. 781; United States v. 65 Casks Liquid Extracts (D. C.) 170 Fed. 449; United States v. 50 Barrels of Whisky (D. C.) 165 Fed. 966.

The first exception to the libel is therefore overruled. A similar exception was sustained in a case in the Southern District of Ohio reported in a bulletin issued by the Department of Agriculture on January 12, 1911, entitled Notice of Judgment, No. 697, Food and

Drugs Act. For the reasons hereinbefore stated, I cannot agree with the conclusion reached in that case.

2. The second exception to the libel is as follows:

"That the libel herein was not verified by any person having knowledge of the facts therein set forth, and that no probable cause for the seizure of said property is shown."

The libel was, in fact, verified by the district attorney as of his own knowledge. Moreover, rule 1 of the admiralty rules of this court provides that libels shall be verified, except those filed on behalf of the United States. It may be added, also, that, whatever objections might have been made to the issuance of the warrant to the marshal founded upon such a verification, the want of a sufficient verification is no ground for exception or demurrer to the substance of the libel.

The second exception is overruled.

3. The third exception is based upon the fact that the date when the eggs were shipped from Chicago is not stated; that, therefore, this shipment might have been made before the food and drugs act went into effect; and that the property is not sufficiently identified. In The Confiscation Cases, 20 Wall. 92, it was said on page 106, 19 L. Ed. 196:

"In admiralty proceedings a libel in the nature of an information does not require all the formality and technical precision of an indictment at common law."

And on page 107 of 20 Wall., 19 L. Ed. 196:

"In proceedings in admiralty the same strictness is not required as in proceedings in common-law courts. And where the seizure is on land [said he], although the proceedings would seem to be analogous to informations in the Exchequer, yet I do not know that in our courts the rigid principles of the common law applicable to such informations have been solemnly recognized."

In Oakes v. United States, 174 U. S. 778, 790, 19 Sup. Ct. 864, 868, 43 L. Ed. 1169, it was said:

"The proceedings were in conformity with the practice in admiralty, and were not governed by the strict rules that prevail in regard to indictments or criminal informations at common law."

The defenses suggested by these exceptions can without difficulty be raised by the claimant in its answer. They are accordingly overruled.

4. It is said in claimant's brief that the fourth, fifth, and sixth exceptions are founded upon the same omission in the libel, namely, that it does not allege that the eggs have been transported for sale. During the hearing it was stated at the bar that as a matter of fact the Loose-Wiles Biscuit Company did not intend to sell the eggs, but to use them in manufacturing. At the time the exceptions were argued (March 10th) this contention presented a serious question. But three days thereafter (March 13, 1911) the Supreme Court decided the case of the Hipolite Egg Co. v. United States, 220 U. S. 45, 31 Sup. Ct. 364, 55 L. Ed. ——. The facts of that case are therein stated, as follows:

"On March 11, 1909, the United States instituted libel proceedings under section 10 of the act of Congress of June 30, 1906, c. 3915, 34 Stat. 771 (U.

S. Comp St. Supp. 1909, p. 1193), against 50 cans of preserved whole eggs which had been prepared by the Hipolite Egg Company of St. Louis, Mo. The eggs before the shipment alleged in the libel were stored in a warehouse in St. Louis for about five months, during which time they were the property of Thomas & Clark, an Illinois corporation engaged in the bakery business at Peoria, Ill. Thomas & Clark procured the shipment of the eggs to themselves at Peoria, and upon their receipt of them placed the shipment in the storeroom in their bakery factory along with other bakery supplies. The eggs were intended for baking purposes, and were not intended for sale in the original. unbroken packages or otherwise. and were not so sold. The Hipolite Egg Company appeared as claimant of the eggs, intervened, filed an answer, and defended the case, but did not enter into a stipulation to pay costs."

The claims of the egg company, as far as they are material here, are stated by the court as follows:

"The egg company, whilst not contending that the shipment of the eggs was not a violation of section 2 of the act, and a misdemeanor within its terms, and not denying the power of Congress to enact it, presents three contentions: (1) Section 10 of the food and drugs act does not apply to an article of food which has not been shipped for sale, but which has been shipped solely for use as raw material in the manufacture of some other product. (2) A United States District Court has no jurisdiction to proceed in rem under section 10 against goods that have passed out of interstate commerce before the proceeding in rem was commenced."

After discussing the cases cited by the claimant upon the hearing in the case at bar, the Supreme Court declared that the first contention of the egg company was untenable.

The fourth, fifth, and sixth exceptions are accordingly overruled.

5. The seventh exception is based on the claim that it nowhere appears that the eggs in question are still subject to the provisions of the act. It is said that the power of the federal government over interstate shipments ceases when the shipments become a part of the state property. It will be noticed that this question also was raised in the case of the Hipolite Egg Co. v. United States, supra. In answer to the second claim of the egg company, which has heretofore been stated, the court said:

"There is here no conflict of national and state jurisdictions over property legally articles of trade. The question here is whether articles which are outlaws of commerce may be seized wherever found, and it certainly will not be contended that they are outside of the jurisdiction of the national government when they are within the borders of a state. The question in the case, therefore, is: What power has Congress over such articles? Can they escape the consequences of their illegal transportation by being mingled at the place of destination with other property. To give them such immunity would defeat, in many cases, the provision for their confiscation, and their confiscation or destruction is the especial concern of the law. The power to do so is certainly appropriate to the right to bar them from interstate commerce, and completes its purpose, which is not to prevent merely the physical movement of adulterated articles, but the use of them, or, rather, to prevent trade in them between the states by denying to them the facilities of interstate commerce. And appropriate means to that end, which we have seen is legitimate, are the seizure and condemnation of the articles at their point of destination in the original, unbroken packages. The selection of such means is certainly within that breadth of discretion which we have said Congress possesses in the execution of the powers conferred upon it by the Constitution. McCulloch v. Maryland. 4 Wheat. 316 [4 L. Ed. 579]; Lottery Case, 188 U. S. 321, 355 [23 Sup. Ct. 321, 47 L. Ed. 492]."

The seventh exception is accordingly overruled.

The claimant is given 10 days from this date within which to answer the libel.